Motion and Petition for a new trial and re-hearing»
• The very frequent refusal of petitions for re-hearing in this court, heretofore, would have induced the counsel for the defendant, to have been diffident in this application, did they not consider the present case an exception to the common rules of proceeding. The reason of the rule of court, which authorizes petitions for re-hearing, is founded on the supposition, that cases may occur, in which it may be necessary to the ends of justice. We do conscientiously believe this to be one of those cases; and that your honors will have less hesitation, in reviewing its merits, from the consideration alone, that your jurisdiction of it, is uriginal and exclusive, and your decision final. Therefore, under the peculiar relations and duties of the court, as connected with this proceeding, we are led confidently, though respectfully, to ask for a new trial and hearing of the prosecution against the defendant, both in point of law and fact:
Because, he is advised, and believes his case has been misconceived in both these respects:
And further, because, since the trial lately had, he has discovered new and important testimony to his defence; and now has in his power, other and further proof, not used by him on his trial, as he was instructed by his counsel, to believe the same would not be necessary.
The counsel for the defendant would respectfully suggest, that the great stake which he has in this trial, is of itself sufficient to give it peculiar interest and consideration. In the present aspect, however, of the case, this is not its only feature of importance. We seri *124 ously believe, that the views of the judicial policy* with which the opinion rendered in this case, is made up, lead to the establishment of principles and precedents in our criminal jurisprudence, alike novel and dangerous- More than twenty years ago, it was decided in this court, that an information against a clerk to remove him from office, should be carried on in the name of the commonwealth, by the attorney general, a part of whose official duty it is, to attend to and manage the prosecution. It may then safely be assumed, that this is in the nature of a criminal proceeding; and of course, governed by the same rules and principles of decision, that regulate similar cases, in all the courts of the state. The decision referred to, was both wise and expedient; because the constitution is silent, as respects the mode of proceeding against a clerk, as well as the rules and principles of decision, which should be observed under it. It was, therefore, indispensable, that the court should both prescribe ia mode,, and declare the nature of the proceeding, to be enabled to act with either justice or accuracy. Every judicial tribunal, not absolutely capricious and despotic, must be guided by certain fixed principles, and legal land marks, in the decision of every one of the various and different cases, that may be brought before it. Hence, we have different rules of proceeding, as well as principles of decision, in the same court, in different cases. That which would be proper and applicable in a suit in chancery, or an action of assumpsit, would be equally the reverse, under an indictment for murder; and we cannot conceive, of a greater cause of injustice to parties, than in the confounding of those rules and principies of decision, or in mistaking their application altogether.
Petition far a re-hearing.
It is true, the constitution has confided the decision of the defendant’s case, to a court of law, and not to a jury of his country. The reason, however, of this provision, is obvious. Clerks of courts, are presumed to be professionally skilled, in all the business of their several offices, and are required to produce a certificate to this effect, before they can be eligible for appointnaent. The correct performance of their various duties, as prescribed by law, requires not an incon *125 siderable portion of legal knowledge; of course, those only are competent to judge of the rectitude and validity of their official acts, whose knowledge of their duties, is presumed to be superior to their own. For this reason, it was, we have no doubt, the convention very wisely provided for the trial of clerks of courts, before the supreme judicial tribunal of the state. But, we premise with confidence, that the character of the tribunal before which they are tried, can neither change the nature of the proceeding against them, or the rules and principles of law, under which it should be conducted. In declaring the court judges of the facts, as well as the law, and requiring two thirds of the members thereof, to concur in a sentence of guilty, the constitution itself, apart from the decision above referred to, may safely be said to have pointed out, and defined the nature of this proceeding, and guarantied to every clerk on his trial, all the legal maxims that apply to a criminal case. We will not, however dwell longer on this point, inasmuch as it is unnecessary for us to enforce the reason of a rule, which has been deliberately established by a decision of the court, and is in every way consonant to the principles of public justice and policy.
'pet;ti ior re-hearing,
We will now refer to some of the leading and settled principles of criminal jurisprudence, in contradistinction to what, has been held applicable to civil cases only. On a criminal charge, the first great maxim is, that the accused shall be presumed innocent, until the contrary is proved; and that no man is bound to show his justification, under a mere suggestion of either fraud or felony. The quo animo, or intention, motive or design, with which an act has been committed, which forms the basis of a criminal charge, has ever been held to be of the last importance, under an inquiry of guilt of innocence. It is only as a free agent, or discretionate being, that man is held accountable for his acts. If, upon no other than this principle, he is answerable before the eternal tribunal, he certainly should not, before an earthly one, be made responsible for acts, as crimes, to which his will lent no criminal intention. It has been solemnly laid down as law, that crimes of all denominations, consist wholly *126 jn the purpose of the human will, producing the act. pjnder a criminal charge, therefore, the first inquiry is, as to the motive of the actor. In very many cases, the law declares the act itself \ to be the best evidence this motive, and will not suffer it to be contradicted, or explained. In many others, where the act does not necessarily fix a criminal design, the motive with which it is done, is always resorted to, it settling its character and consequences. Where this is the case, (and we contend, that of the defendant to be precisely the same,) the law declares, that every thing should be taken, and construed most favorably for the accused; and that his guilt, according to the principles here laid down, should be made apparent by evidence, uncontradicted, clear and conclusive.
Petition for a re-hearing.
Notwithstanding these well known, and long Settled principles of criminal jurisprudence, the court have laid it down, as a rule of decision, in the present case, that, “In adjudicating upon the conduct of clerks, this court cannot enter into consideration of the motives which influence their conduct. The simple inquiry under the constitution, is, has a breach of good behaviour in office, been established by the proof? If it has been, whether it proceeded from ignorance, good intentions, or bad, the consequences are the same to the community.” This, with submission to the court, is a doctrine to which we cannot subscribe; which is contradicted by the principles, on which all similar cases have been decided; and which, in its practical operation, would sweep from office every functionary of the government. If this court sits as a mere standard of the law, to pronounce its simple dictum; and,, according to which, every case like this, is to be measured, regardless of every thing, but the law; why does the constitution provide, that “the court shall be judges of t\\e facts, as well as the law?” This does not apply to a mere decision on the sufficiency of proof, to show that the law has been violated; because the proof is necessary to the judgment of the lav/, which it was not designed, should be abstractly, or hypothetically declared. But, in making the court the judges of the forts. expressly, as well as the law, the constitution certainly confers on them, and means *127 they shall exercise a sound discretion, on whatever is calculated to fix the true character of the case, as it respects both the act and the intention. The counsel cannot perceive a difference in the principles of decision, betwixt this and a case of impeachment. Both proceedings lead to the same result; deprivations of office, for misbehaviour therein. Neither can they conceive a difference in the principles, or obligations, of official duty; but suppose, that the faithful performance of which, among all public officers, should be tested by the same rules and principles. It has been remarked by the court, that the duties of a clerk, are chiefly ministerial, prescribed, and definite; and therefore, according to the rule of decision above referred to, he is presumed to have neither official discretion, will, or design. It is true that the duties of clerks are principally ministerial: yet, we know that many of their official acts require both deliberation and judgment; that they have frequently to decide on the law, as it may, or may not be, and that the law requiring them to produce a certificate of qualification from the court of appeals, before they can be eligible for appointment, not only presumes, but requires them to possess capacity, knowledge and skill. Why, then, are they above all other public officers, to be deprived of official motives? Incases similar to this, the motives of public officers under trial for misbehaviour, have been held as a sacred principle of defence, and their right freely to go into them, in either justification or extenuation, has never been questioned, or refused. In the trial of Judge Chase, the most momentous and important lenown to the nation, this constituted the gist of the inquiry; every charge, or article of impeachment, against him, alleged corrupt motives in his official conduct, and the whole case was argued, and decided on the principle of intention. But, why need we resort to other cases, or analagous proceedings, when there is to be found, in the records of this court, nay, in the proceedings of this case itself, confirmation of the doctrines we advance. The information filed by the attorney general, against the defendant, is according to form and usage, in cases of this kind, and it is presumable, contains nothing but what is necessary to the legally setting forth the charges against him. What *128 Joes that information aver? The quo animo, or corrupt intention and design of the defendant, is coupled with every charge, and constantly alleged, in his official acts, of which complaint is made. Notwithstanding ^’s' Pr¡nciple °f the decision rendered, goes the length, that the commonwealth is not only excused frOm proving this important allegation, or averment, but that it shall not avail the defendant to disprove it. In the case of the Commonwealth vs. Thomas Arnold, clerk of the Bourbon circuit court, on a proceeding precisely similar to that against the defendant, upon almost every point, and under every charge, the court coupled the motives and intentions of the party, with his official acts. One of the charges against that clerk, was, his permitting one Miller, to act as his deputy, without the requisite and legal qualifications. This was fully proved; and an act of the legislature adduced, and relied on by the attorney general, which forbid deputies thus to be employed, by any clerk, under a penalty of £50<\ In reply to this, the court, in their opinion in that case, say, “the defendant must be admitted to have acted incompatibly with the strict duties of his office.” But this they allow to be palliated by circumstances, going to show no improper intention or design, in the clerk. Arnold repeated this offence, even after the information was filed against him; yet, the court said his conduct in that was not of a character, which ought to induce his removal from office, because, they say, “the proof is satisfactory, that his having done so, was not the result of any thing like contumelious behaviour, but an honest conviction of its propriety ana correctness.” Another charge against Arnold, was, his refusing to issue process in particular cases, when legally and properly called on so to do. The proof accorded with the charge. In reply to this, the court said, his reason for such refusal, was not satisfactory; but they thought it “sufficient to excuse him from a wilful abuse of the duties of his office.” And the court further say, in reference to this same charge, “It is impossible for a candid mind, after reviewing the reasons assigned by the defendant, to hesitate in acquitting him of any corrupt or impure moíróe.” Again, Arnold was also charged with having made out a false and imperfect record, in a particular *129 cash, and refusing to correct the same when called ón so to do. To this, the court also say, “the evidence is insufficient to establish a corrupt or wilful abuse of defendant’s office, he being honestly of opinion, that what was alleged to be necessary in the record, did hot, in truth or law, belong to it.” We will recite one further charge, with the decision of the court oft it, in.the case of Arnold; he was charged with having exacted, and received, illegal lees in his office. Upon this, the court say, “We might have entertained a different opinion, if any thing like corruption or impure motive, was proved to have actuated the defendant, in charging fees for services, before, in fact, the services were performed;” a positive law, then in force, interdicting clerks from issuing their fee bills for services, until they were performedi
Petition for a re-hearing,
Petifion fora re-hearing.
petilion for j re-hearing.
Here then, with submission to the court, we have. principle supported by precedent and authority; and a full and unqualified recognition of the position.; we presume, in this case; that this being a criminal.proceeding, it should be conducted and decided on,' according to the same rules and.principles, that apply to criminal cases generally; and that the motives and; intentions of a clerk,.when accused, become a fit subject of legal inquiry, as they go to fix and establish the character'arid tendency of the acts, of Which hé is charged. Under the opinion in the Commonwealth vs. Arnold, just referred to, we might go even further than this: there, the court, in commenting on the charge of taking improjier or illegal fees, use this , emphatic expression: “We might have entertained á different opinion, if any thing like corruption, or impure motive, was proved to have actuafed the defendant,” &c. Here, a legal violation of the defendant’s official duty was shewn; nevertheless, the court, in conformity to the averments of the information as filed, whicli allege an impure motive in the defendant, seem to require proof of the truth of those averments, and in the absence of this proof, to presume the defendants innocence. Thus, the defendant is not. merely permitted to justify his conduct," by his motives, in shewing them to be good, but the' prosecufor is required, in accordance with the allegations of the information' *130 filed against him, to prove them to have been badt Notwithstanding the force, and high authority, of this decision, we do not ask for the defendant, any thing further, or more, than permission to justify himself accor<l>ng to his motives, by which, vith an examination of his official conduct; under the rules of criminal inquiry, he is willing to stand, or fall.
PctitiorTfbra re-hearing.
In declaring, what is hereafter to be the settled law,touching the duties and Responsibility of clerks of courts, the court, in the opinion, of which we pray a revision, further say: “In conclusion, we shall state, that good behaviour in a clerk, consists fn discharging accurately, and faithfully; and in proper time, all the duties required of him by law; in making correct records of the judicial acts and proceedings of his court,under the' superintendence of the court, so that the' whole record, when signed, shall have received the approbation of the court; and then, in preserving the Records so made, inviolate and unchanged, subject alone, to such amendments as may be made by the court; and in certifying that which the law requires' him to certify, and that which the record warrants him to certify, and nothing more nor lesé.”
The above may be looked on as a positive declaration of the law, now settled and adjudged, and intended to operate on all cases hereafter, similar to that in which it is given. Considering what may be the future influence or effect of the rules thus laid down, the counsel for the defendant, would have no-' motive at this time, either to recognize their fitness^ Or question their propriety; but, with reason to believe, that they were conceived in reference to the case of the defendant, and had their influence in leading to the conclusion upon it, as notified from the bench. We are constrained, with proper respect for the" court, to apply to those rules, the objections to' which we think them entitled. For the present, we' will not attempt to discriminate betwixt the rules themselves, and the construction which the court has' given them; but consider of the effect of the rules' under the construction they have received. In thus defining the rules of good behaviour in clerks, we are to understand from the court, that whatever may be' *131 done or omitted, contrary to those rules and principles of duty, constitutes a breach of good behaviour. For the court have, as before referred to, said the simple inquiry under the constitution is, “has a breach of good behaviour been established by the proof?” If it has, no matter what the intentions of the party may be, he is declared to be culpable. As far as these rules of “good behaviour” go, they were no doubt intended to be obligatory. Tile meaning of the court, it is believed, cannot be misunderstood. The opinion rendered on this point, is declarative; it defines and specifies, and without saying what may not be done, it declares what shall. Of course then, the court have declared in this decision, that a violation of either of the rules of official duty, therein prescribed and settled, for the behaviour of clerks, shall hereafter constitute cause of removal. Is there a clerk in the commonwealth, let his qualifications and integrity be what they may, who could hold his office for three months, under an application pf these principles of decision? Notone. In the language of a former chief justice of this court, alike distinguished for talents and integrity, the well earned, and most ..elevated reputation of a meritorious clerk, would, for the least error in office, be degraded by the sentence of the law, to a level with the 'vile and corrupt, who, by labor of office, shall have inflicted the most serious outrages on the community. “A princijple, (say the court in the case of the commonwealth vs. Arnold) which thus tends, in its consequences, to place on an equality, guilt and innocence, cannot be admitted the correct doctrine of the law.” To this opinion of the court, as formerly expressed, we can all adhere; because, it carries with it, self evident convictions of truth and justice, and leads to no consequences, that innocence should dread. But, where a breach of good behaviour in office, and an unintentional violation of any positive duty of such office, are declared to be one and the same thing, we may look for consequences equally perplexing and disastrous. This doctrine is destructive of the grounds of public confidence, as, well as the principles of public service. It leaves no motive to official integrity; confounds the guilty and the *132 unfortunate, and deprives merit of .its reward, in making no discrimination betwixt the good and the bad.
for re-hearing.
Petition for a re-hearing.
The counsel in thus considering of theconsequences of a decision, need not, it is hoped, declare that they do not thereby intend the slightest disrespect to the court. The case before your honors js a highly important one; of the greatest magnitude to the defendant, and likely to furnish a precedent of serious consequence to the state. Therefore, it was thought, a free enquiry into the principles involved in it, would be neither unacceptable or improper.
In reference to the rules of behaviour in office, as laid down for the information and government of clerks, apart from the construction they have received, as applicable to the present case, we bave no hesitation in declaring our conviction, that they are legal, just and salutary. It is the construction and application, which these rules are made to receive, to which we do most earnestly, object. We have no doubt, but that they correctly point out and define the duties ©f clerks, whilst, at the same time, we cannot admit, that a violation of any one, or ail of them, would, of itself, amount to a “breach of good behaviour” in office. Herein, with due submission, we verily believe the court have mistaken the true meaning and import of the constitution, by the construction they have put on the words “breach of good behaviour.” The framers of the constitution never could have supposed that clerks would be infallible, or exempt from the usual portion of human frailty, What then is meant by the term good, behaviour?, Was it designed to express an entire exemption from all error, and perfect official infallibility, or used as a contradiction to its opposite, badl behaviour? Good, behaviour, may be considered as a series of habitual rectitude and propriety, in reference to either official,or private conduct; and bad behaviour precisely the reverse. An individual would acquire a reputation for either, just as bis common habits plight incline him to one point or the other. Good behaviour, like good character, may be looked upon as an unit, although made up of many acts and pieces of conduct. What would he a breach of good character? A mistaken motive of right or wrong, or any error incident to human frailty? To this we must all say no. *133 % breach of good character, would require an habitual ¡dcparture from rectitude and propriety, or the com-minion of some act of essential turpitude, and incqmpatibie with the principles oí right, justice and honor. In the same way, a breach of good behaviour in office, would require an habitual neglect of, and departure from, the duties of the same, or the commission of some act, shewing a corrupt intention, incompatible with the public duty and safety. We must receive and apply terms, as they are generally used and understood. What do we mean when we speak of the good behaviour of a'governor, a judge, sheriff or any other public functionary? Do we mean an exemption from all error, and perfect official infallibility or a general intention and habit of conduct, to do right, as far as human nature and frailty will permit? We cannot hesitate in responding to this enquiry. Perfection and infallibility is not looked for, much less found in man; and vve have no doubt, but that the framers of the constitution, in providing for the trial of clerks, and specifying the cause for which they should be removed from office, considered the term good behaviour in the same light that we have viewed it, and intended it should so operate and be received. Any other construction is contradicted by all the authorities and analogies of the law, and leads directly to the unjust and dangerous consequences which we have attempted to expose.
pet¡t.inn fora re-henring.' "
Before we advert to the view, which the court have taken of the evidence in this case, we will offer a few remarks on the subject of the minute book. In the argument of the case to the court, the counsel for the defendant, did not assume the position, that the minute book, without the signature of the judge, is of itself, a perfect and valid record. This they know is not the fact, whilst they did contend, and now repeat, that the original minutes of proceeding, when signed by the court, is a record, against which, a plea of mil tiel record could not prevail. The circuit courtis a court of record; yet, the law instituting and organizing the same, does not specify or require any particular form or size of record, further, than that a fair and perfect record be kept of all the proceedings had in said court. There are many circuit courts in the state, where no *134 other record is kept, than the book of original entries; what is called the minute book, and the order book, being both blended into one. The court, we have no doubt, point out what should be the practice, correctly, when they say that the orders of court.should be extended daily, and signed by the judge. There are, however, but few of our circuit judges who adhere to this practice, but rely on the mjnute book, from one term to another, and sometimes even without signature, as evidence of their judicial proceedings. In the same court, of which the defendant is clerk, one of the counsel knows personally, that nothing was more common at a former period, than for all of the business of the three or four last days of a term, to be entered in the minute book only, and not carried to-the order book, until the ensuing court. We do not offer these remarks in approbation of this prabtice or proceeding, but merely to show the court the impression which might have been made on the clerks in many circuits, as to the validity of the minute book. In the Scott circuit, particularly, this validity has been relied on, and often sanctioned by the opinion and conduct of the judge. We think it proper, that these errors and practices should be corrected, while we also think that the denunciations of this court, had better be directed against the circuit judges, than their clerks, who are all, more or less, under the influence and control of their respective courts.
Petition for a Te-jiearing.
Without the signature of the judge, and as presented to this court, we relied on the minute book as evidence only, that an allowance was made by the Scott circuit court, for Hans Peeples of $30, in September, 1820, although the same was not recorded in the order book; and as further evidence, that the defendant, had in truth and fact, though not of record, the order and sanction of the court, for the certificate he made to that effect; and as stfll further, and additional evidence that the defendant was guilty of no fraudulent intent, or corrupt motive in giving said certificate, because, he had the sanction of the court, for so doing, as is evidenced by the minute book; and might well have been deceived, and mistaken, as to his carrying the entry in the minute hook,into the order book; which *135 he alleges was really the fact, and the truth. Relying then on the minute book as evidence only, to support those facts, we refer the court to 1 Starkie, Ev. p. 72, where it is laid down, that even private entries áre admitted as evidence, when made by a party, having peculiar means of knowledge, and made in the course of & particular routine of business, at the time of the supposed act. A fortiori, as was held by the supreme court, in the case of Nichols vs. Webb, 8 Wheaton, p.' 326, are entries made in the books, of a notary public; and we say, a fortiori, are the minutes of a clerk in court, evidence, though, they be not technichally records.
Shearing,
If we be correct in the law, with the rules of its application to the present case, there is no difficulty in reconciling the evidence to the innocence of the accused. We received the declaration of the court, on rendering the.opinion, that no dishonorable or fraudulent intention was imputed to the defendant, with great pleasure, both as it respects his character and feelings, and the very safe and favorable light in which it places his case. For if such be the impression of the court, which we have no room to doubt, we cannot resist the belief, that according to the authorities and examples here submitted, your honors can have no hesitation in acquitting the defendant of crime. We cannot suppose, in either public or private life, that the constitution and laws of our state, were ever designed to confound the innocent with the guilty, or on their, application to the great purposes of society, that they require a construction subversive of the principles of both public and private justice.
The case of the defendant is now brought to a single point, of both fact and law, in certifying officially, the allowance of September, 1820. Was he justifiable, or excusable in committing that act? The court have said that he isneither justifiable or excusable, and have founded their opinion on the proposition. 1st. That the order in the minute book, of September, 1820, is not a record, and therefore, not legally certifiable by the clerk. 2d. In making such certificate he committed a breach of good behavior, for which they are bound by the constitution to remove him, without reference to *136 either his motives or intentions. Here an issue of law is fairly and fully made up in the case, and upon which we would be perfectly willing to risk its final decision! The views, however, which the court have bestowed 0D many Parts°f the testimony, require of us, injustice to the defendant1, some remarks in support of his conduct; and hefe, we tóíght practically enforce the correctness of otir remarks, as to the court’s being judges of the facts, as well as the' law. Reason and justice would forbid us to suppose, that the court intended', in a criminal proceeding, to establish a rule of decision which should operate partially on an accused. If the motives and intentions of a clerk, are not to be considered, in extenuation of his acts, on a trial for breach of good behavior in office, is it just that jhey should be referred to in aggravation of bis conduct? A doctrine thus monstrous, in either criminal or civil practice, it is believed, was never designed to be established, and could not, if even asserted, be adhered to and maintained. If the motives of the party, are not entitled to weight in this case; we cannot see the force of the chain of reasoning adopted in the opinion, to fix, by inference and deduction, an impure and dishonorable one on the defendant; unless it be a recognition of the doctrine for which we contend, as to the weight and force of intention in this, and all similar cases. We are not to presume that the court, in this, have acted extra-judicially, or done any thing gratuitously, or that was unnecessary. To the court’s,having gone, into the motives of the defendant; we offer no objections; our complaint is, that his motives and intentions have, not been construed according to the liberal rule's and principles of the law, governing all cases of this kind. Under a declaration of the court,' that motive was not to explain, or extenuate error,' it is impossible they could have recéived this construction.'
Petition for a id-hearing.
It is not to be presumed that the court have been influenced by any part of the evidence relied on in this, case, other than what has been presented, as material and operative, in the opinion itself. We might notice several minor points in the evidence, that , have been adverted to by the court, could we possibly suppose they received the least weight in making up the decision ; such as, that the certificate on the treasury, the *137 freport of Holland, Sic. were in the hand writing of the defendant, the conversation in the clerk’s office between the defendant and Rhodes Thompson, in presence of Major J. T. Johnson, that the entry in the minute book, of September, 1820, was at the bottom of the page, &c. &c. A 'suggestion even, should ’not be indulged, that the court would insinuate, what they haye refused to avow. If the whole transaction, touching the order of September, 1820, was not impure and corruptly criminal, what have these things to do with it? The court, it is understood, have disclaimed an imputation of those motives. If the defendant had an improper, or criminal design, in his interview with Rhodes Thompson, Major Johnson is equally guilty; because, in his testimony he acknowledged himself a privy to that conversation, and explained the motives of it. In the routine of business; the order in the minute book might as easily have been thrown to the top, or middle, as the bottom of the page. The only question is,-is there such an order? Is it genuine? Thatdhe order is there, is undisputed; and what it purports to be, it is, and must be so taken and considered, until the contrary is proved; was the contrary proven? certainly not; neither have the court so assumed in their decision. Then we presume the order miist stand, and be. taken for whatever it is worth, in justification of the defendant’s motives in the case.
Petition lor a re-hearing.
In reference to the testimony of Aaron Holland, we must be permitted to say, in our opinion at least, that the defendant has received great injustice from, the construction given it by the court. In the first place, the defendant produced his minute book of September, 1820, wherein is an entry ordering $30 to be com tinned as an’allowance, to Hans Peepíes, and that Aaron Holland be continued a committee, He also produced a report of said Holland, dated the following March, and signed with his own proper hand, as proved by himself, wherein is set forth and said to the court, that he, Holland, had appropriated this same ‡30 to the use of the lunatic; the court say that the ‡30 was not appropriated by, or through Holland, on the ground that he nozo has no recollection of having so appropriated the money, and does not believe that *138 he ever did. Now, in any case,civil or criminal,which? according to the settled rules of evidence, is first to bé relied on, the memory of a witness, after a lapse ©f nine years, or his written report, under his own proper hand, of even date? We have only to advert to a whole current of decisions, for years past, of this court, on the relative weight and validity of written instruments, in comparison with parol proof and personal statements and recollections, to answer this question. The decision of the court upon this point alone? itis believed,is opposed to the settled rules of evidence, as well as the general policy of the law, in all cases whatever. But, this opinion is attempted to be justified on the ground that Holland’s recollection, in contravention of his written acknowledgement, is aided and strengthened by the testimony of Lyle. rfo this, it is respectfully replied, is it not still parol proof and recollection, in contravention of written evidence, and this too, after a lapse of nine years? Take this as a general rule of decision, and where would it lead us? It is confidently hoped, that no decision in this case will form an exception to general rules; an observance of which, is always most safe and salutary.
Petition for a re-hearing.
The counsel, with submission to the court, do not rely on the lapse of time in this case, on any other ground, than, as it deprives the defendant of testimony which he then had, and would have been able to produce, and, as it furnishes the strongest and most unanswerable objections to nearly all of the evidence which is relied on against him; and this leads to a few remarks on the testimony ©f Mr. Lyle, with which we shall conclude. It will be recollected by the court that this witness swore to impressions, and not to words; that his general testimony was indefinite, and that he frequently qualified his statements, by declarations that “he might be mistaken.” What reliance ought to be placed on this kind of proof, after a lapse of nine years? The court have sufficiently answered this question, by stating in their opinion, that they found his memory to have failed him on another branch of this same cause. The defendant fortunately, was enabled to disprove his recollection under one important charge; should it then have been relied on as principal support to another? We think not, and farther think, that the safest *139 and best settled rules of evidence have been violated in the importance which has been given to the testimony of this witness, by the court. The general law, as to the weight which should be given to impressions, conversations, recollections of words, and hearsay evidence, is too well understood, and laid down with too much accuracy, to require comment by us. We cannot, however, refrain from giving the words of this court,, in a decision, which embraces so emphatically, the grounds of our objection to the testimony of Lvle. In the case of Morris vs. Morris, 2 Bibb, p. 311, the court say: “The evidence in support of the appellee’s claim consists of the declarations and confessions of Maurice Morris. Such evidence, in cases where it is adm-<sible, is of the most unsatisfactory kind, on account of the facility with which it may be fabricated, .and the difficulty of disproving it when false.”
petition for a re-hearing,
Response of Robert» petitionfor a re-hearing,
Crittenden and Richardson, for defendant.
Upon the foregoing points, the counsel for the defendant have not essayed to controvert the principles of the decision rendered, in discharge of their professional duties only, or with the view of merely combating, by argument, an opinion of the court. For both the intelligence and integrity of this court, they entertain the highest respect, and would not question the propriety of any decision made by it, without due reflection, and the sincerest conviction of being supported by both law and reason.
The motion for a new trial was argued, and the following seperate opinions delivered by judges Robertson and Underwood.
Opinion of
Judge Robertson.
Anxious to give to the evidence in this prosecution, a construction most favorable to innocence, and to escape, if possible, from the necessity of concurring in the judgment of amotion, I endeavored, with deep solicitude, to find some good reason, that would justify, to my own conscience and to the integrity of my station, the acquittal of the accused. The opinion, which after full deliberation and a close scrutiny of the facts proven, I was compelled to form on the case, did not. allow this personal gratification.
Response of juilire Roberson to the pe'ition for a re-hearing.
■ Hoping, however, that- the zealous and'able counsel qf Mr. Chambers, might be able to present some consideration on an application for a- new trial* which would suffen me to.change my opinion, I-was pleased that tiiey presented and argued a petition for a reconsideration. I have carefully, and anxiously attended to all that has been said; but my former ■ opinion r,e/ mains unchanged.
The argument has scarcely touched the point which-controlled my opinion, and has, therefore, not removed the difficulty which I had unsuccessfully endeavored to, giirmount. The counsel have relied.chiefly on an alleged good motive for the main delinquency charged. They animadverted elaborately, on the expression in the opinion of the court, which states that, the court did not enquire, into the motives of the accused; and have insisted that motive is essential to the character and responsibility of- every act. Whilst this is admitted, in its most unqualified extent, still it may be seen that it cannot materially affect this case.
The sentence-in the opinion which has been subject-, ed to criticism, and has formed the test of the argument by the counsel, has. been misconceived and misapplied, Its phraseology may be, and cortqinly is more comprehensive and general in its import than was intended, or would be understood as intended by the court, when it is taken in connexion with other parts of the opinion, and applied to this case.
The doctrine which the court meant-to maintain, was that acts might be done by an officer, without corrupt motives, which would, amount to misbehaviour in office; that the acts for which the court sentenced Mr, Chambers tq removal from office, were acts..of that kind; and that consequently, in such a case, it was. not necessary to inquire into motives.
The court did not certainly, mean to say that motives would be immaterial in any and every inquiry int© $he acts of clerks.
There are many acts of inadvertance, mistake, omis§ipn? unskilfulness, negligence, &c, which would be only misprissions of the clerk, when unaccompanied with improper motive or design. On a charge of de *141 linquency of this kind, the motive of the clerk, or whether there was any motive or not, would be not only material but indispensable to the complexion and the consequences, to the officer, of the act. Any corruption in officers misbehavior in office; and, therefore, any official error of a clerk, instigated by motives of corruption or cupidity, however trivial or venal the act may be in itself, abstracted from the quo animo or intent, amounts to official misbehaviour. But small errors, resulting from a mistake or want of skill, or from inadvertence, or from the imperfections or frailties incident to all men, would not be considered breach of good behavior. Hence, in cases of this sort, the motive is essential. In the absence of any motive or of an improper motive, these acts should be excused, unless they were so frequent and habitual as to prove incapacity for the office, But if they were the result of corrupt or improper motives, they should forfeit the office, however minqtq they might be, or rare in their occurrence,
¿p’ap“se af ' j,K]ge Jtr.bertson to the
Such were supposed to be the charges preferred .against Arnold, the clerk of Bourbon. And hence, in that case, the court exculpated the accused, because, they had no evidence of perverse intentions or dishonest motives.
But,if there are any acts, which,perse, without the aggravation of corrupt motives, constitute misbehaviour in office, whenever such acts are proved, an enquiry into motives, cannot be material to the decision of the court. They may be of great consequence to the accused personally. For good intentions, may rescue his character from degradation or reproach, But the sentence of the constitution, being dismission from office, on conviction, the inoffensiveness or integrity of motive cannot avert, or mitigate that sentence, any more than corruption could aggravate or extend it.
It was in this view of the subject, that the court, believing that the main charge against Mr. Chambers, was intrinsically such as to amount to misbehaviour,, thought proper to waive all consideration of his motives. And in this I still think we were right.
The question then is, does the act charged, show, of jtself, misbehaviour in office? The charge is, that Mr. *142 Chambers presented in person, to the auditor, an offtcja| certificate, signed by himself, as clerk of the Scott circuit court, of an order in form and in extenso, purporting to be a true copy from the records of his office, when there was no such record; and on that certificate drew from the treasury $30. I thought, and am still compelled to think,(without any allusion to motive,) that jf any official acts, unalloyed with a corrupt in-can ^ consi<jerefi a breach of good behaviour, this is one of them. If it is not, I have not yet heard of, nor can I imagine any act short of corruption, which can be misbehaviour,
se of judge Robertson to the petition fora re- earing.
One of the cbunsel admitted that there may be acts which, although untinged with corruption, amount, in the language and intent of the constitution, to misbehaviour in office; and they failed to show, indeed they scarcely attempted to show, that the act charged 'against Chambers, is not included in that class. They certainly ffia,dé,i?o effort to show what acts are includipd ,in this classification, or to assign any reasons for dis-tin’gfiishípg, from those cases, the act imputed in this case. Wears, therefore, left where we were before, to .diside for ourselves, by the dim light of our own -judgments.
If a clerk inadvertently omit to enter on his order book, a judgment rendered by the court, and noted in his minute book, no just or reasonable man would say,, that this was such a breach of good behaviour as to subject him to removal from office; because all men, however faithful or honest, are liable to such accidental omissions; and puuishment for an occasional neglect of this kind, could not accomplish the end of all just inflictions, viz: the prevention of similar accidents; and also, because that never was intended to be misbehaviour, from which no officer who is only a man, can hope to be entirely exempt. But if that judgment were against the clerk himself, and he wilfully omitted to enter it on his order book, for the purpose of promoting his own interest, all honest men, would denounce him as unworthy to retain his public trust; such is the importance of motive in each case. But suppose the clerk in a case in which he had no personal interest, shall have unintentionally omitted to enter a judgment. *143 andafferthe adjournment of the court, the defendant having removed from the state, the clerk, on the application of the plaintiff, shall make out a formal judgment and certify it officially as a copy of his record, so as to éüable the plaintiff to proceed on it, and imprison the defendant, in a foreign state, would this be a venal act? Would it not be misbehaviour in office? If it would not be, I am at a loss to conjecture what would be. No motive could make it less than misbehaviour.
Response of judge Robertson to the petition for a re-hearing.
The integrity of the public records should never be suspected. Their verity cannot be disputed. They are indisputable and conclusive, and the public interest requires that they should remain so. The.record cannot be denied or contradicted, nor can any official certificate or authentication of a record, made in proper form, be drawn into question. Hence theindisf: sable necessity that clerks should be carefuL pulously exact in the preservation and the records of their courts. They araifhat^Termitted to alter a word or letter. They mus* diminish. They should certify “the tru\ truth, and nothing but the truth.” Tarrean neyq be suffered, with impunity, to certify, and current, as true, that which they know to 1 can they be allowed to certify as a tru record, any thing which they do not know to exist. If they shall be suffered thus to act, they may become extensively mischievous; and all the assurances of record and many other equally important rights will be jeopardized. We could then no longer appeal to tbe records of our courts and the certificates of our clerks as the sure tests of truth. A clerk, even the very best clerk, may, through accident or mistake, fail to copy in a particular case, every word of a record, which he honestly certifies as a full and perfect copy. This we know is sometimes unavoidable. We expect it to happen occasionally; and when it does happen, we look over it, because the most vigilant clerks cannot always avoid it. But any clerk, however negligent or ignorant, may avoid certifying as a copy from his record, a judgment which is not on it. Ño clerk should give a certificate purporting to be a copy from his record, without inspecting his record, and actually copying from it. He cannot be excused for authen *144 Beating as a copy, what does not exist, or what lie has noj geen an(j js totally ignorant of. He is a ministerial officer. His trust is a highly important one. He js the depository of the public confidence. His chief duties are to keep safely and copy truly. He must not usurp judicial power, and should beheld responsible for every breach of duty, of which no careful and honest clerk can ever be guilty. He cannot be perf0 <j0 that, which, if generally tolerated, must tend to the subversion of all confidence in his acts, and of all the securities of his office.
R, • ons > o7 judge Robertson to the petition for a e- e ring.
It is sometimes difficult to determine, whether a particularact amounts to misbehaviour in office. It is frequently a perplexing question, not to be solved by the application of any general rule or principle. But there is a plain test for this case. It is that, by which, and which alone, every question of moral fitness or public justice is determined. It is this: is it better for the community and the cause of justice, that a clerk should be removed from office, for certifying as a true copy front Ms record, a judgment which the record does not contain, or that, by Ms acquittal, all clerks should be licensed to follow Ms example? If Mr. Chambers shall be discharged, every other clerk may do as he has done, with perfect impunity. This is the inevitable consequence of his acquittal; and it might be fraught with tremendous results. Such an example might even tempt those who may be inclined, to knavery, (if there be such,) to engage in the most corrupt practices, in the hope, that their villany would escape detection, under the guise of inoffensive motives, or the cover of accident, inadvertence or mistake; for fraud is artful, and cannot often be fully exposed. Besides, what more should he required than'the simple fact, that a clerk has cer-. tified, what he knew did not exist, or at best, that of which he was ignorant?
I do not consider this a criminal case, in the sense in which the counsel for Chambers seemed to view it. If it were, some turpitude of intention would be required to be clearly proved. An officer cannot be punished for crime in this court. If he prostitute his office by the commission of a criminal act, in his official character, this is misbehavior, for which he should bé re5 *145 nioved. But for the crime against the laws of his country, he can be tried and punished only by a jury. There can be a gross breach of good conduct in office, without tfie taint of wicked motives. The public interest arid the general welfare of the commonwealth, in my opinion, require, that this case- shall be so decided as to guard inviolate', the archives of the state. It must be a case of misbehavior in offich;
Response of judge Robertson to the petition for a re-hearing.
I am fortified in the'opinion which I have reluctantly formed in this case, by the unanimous opinion of the-court of appeals, in the prosecution against Barry, the clerk of Ohio county. The principal 'charge in that case, was, that Barry had erased the name of an individual, placed by the sheriff on the pannel of a grand jury. Barry stated that the man whose name ^vas erased', was the malignant enemy of Barry, and that he feared that h¿ would, if retained on the jury, endeavor to find a presentment against him unjustly. He knew that if this were so, the court would discharge the man from the jury, on being informed of these facts; and that, consequently,he had reason to suppose that he was not Committing a great error, by running his pen across hfs name: The public could sustain no great injury by such a practice, if it should be tolerated, because the court and the sheriff could prevent any mischievous abuse, and there could be no difficulty in procuring a grand jury. Barry, in this Case, was not inñuénced by any very reprehensible motive. It is even rendered probable that he did not believe that he was doing wrong; his counsel, Clay and Atlin,só argued; and they urged with all their great power and eloquen'ce, the same arguments about motives, &c. which have been so eloquently.addressed to this court. But it was all unavailing. The court removed Barry from office. The counsel, dissatisfied with the judgment, struggled for anew trial; they failed, and their client lost his office. The court, in this case, after noticing .the palliating circumstances urged in favor of Barry, say: "the preservation of the files, records and returns in the various departments of government; is of such importance, and the violation of duty in that respect; by an officer himself \ is of such dangerous example, that nothing can justify it; and *146 the motives in this case cannot be considered by this court¡ as palliating the offence.” This is strong and direct authority.
Response of judge Robertson to the petition for a re-hearing.
Another charge against Barry was, that a replevin bond, filed in his office, payable to Handiy, for whose benefitjudgment had been obtained in the name of Perkins, was altered in his presence, by blandly, so as to make it payable to Perkins, the nominal plaintiff, and that Barry afterwards issued execution on the bond thus altered. His counsel again insisted that theis client was not influenced by any selfish or personal motive; that the bond was in form, merely,, defective, and might be quashed, because it did not correspond with the judgment in the names of the parties; that Handiy was the beneficial party, and Barry ought not to be made responsible for the act of Handiy, which Was only intended to correct an accidental error, especially as the debtor made no complaint. But the court disregarded this argument and decided, that for this too, Barry ought to be removed from office. In their opinion on this charge, the court say, “the defendant’s counsel have insisted, that as the judgment and execution were for the use of Handiy, although obtained in the name of Perkins, which probably aecasioned the mistake in taking the replevin bond, the alteration tended to the attainment of justice, and that therefore, the defendant, having that in view, cannot be criminal.
‘‘This argument is founded on the monstrous maxim ‘that the end justifies the means.’ Can it possibly be right that the clerk shall make himself the judge between the parties? That by an erasure or alteration of the papers or records of his office, he can be permitted to change or alter the situation or rights of the parties, in the absence and without the knowledge or consent of oneof them? The dangers to the community result* ing from such practices, give a sufficient answer.”
Here there was no sinister motive; no person was or could be directly injured; the money was going to Handiy, and it was immaterial to the debtor whether the bond was payable to Handiy or Perkins. So thought Barry, and therefore suffered Handiy to make the alteration. Yet /hr this he was removed from office; and his sentence was just and was approved. *147 Whoever will read this case, will find that it is not as strong as the case of Chambers, and presents a more favorable aspect. Barry petitioned for a reconsideration, and his able counsel presented to the court, in the most imposing garb, the prominent arguments which distinguish the petition in this case. Among other things, they insisted that the acts proved on Barry were innocent and neutral\ that no person was injured or complained; that he did what he thought was right: was uninfluenced by corrupt or unworthy mo-lives; that if he erred, his error was one of judgment, to which all men, however virtuous and enlightened, are liable,' and that every clerk in the state should be expelled from office, if it was right to remove Barry, &c. &c. Butin overruling the petition, what did the court say? I will only give the following extracts:
n?p q{ jadge°Robertson to the petition for a le’ eanng'
“As to the second charge, it has been contended that the defendant had nothing to gain by the alteration of the bond; that it would have been more to his interest that the bond should not have been altered, but that it should have been quashed by the court, as he would, in that event, have gotten more fees by it; that there was no criminal intention.
“These statements may be correct, but whether they are so or not, is not material with the court. The act of permitting the alteration was a deliberate one, it was a voluntary one, and it was unlawful; nothing, therefore, can justify it.”
“It is said that this court ought not to remove for bare error in judgment; this is correct to a certain extent, and yet it does not bear upon this case. First, because this is a case in which the clerk had no right to judge; nor is there any thing in the law concerning the duties of clerks, or any known custom or general practice among them, which-seems calculated to have misled the defendant into such an assumption of judicial functions; as well might he have attempted to give-judgment itself. And, secondly: If he really was in error with regard to his authority, it shows such gross ignorance as to render his tenure of the office, dangerous to the community. Were such practices, permitted, what security could individuals or society at large have, for the safety of their property, their rights to *148 which, depend upon the records,which, in themselves, import such absolute verity, that they cannot be contradicted. With what ease might the covenant in a deed, a judgment or a will, be most essentially changed; and all this might be done and excused upon the or'capricious judgment of the clerk, by yjhich he might be misled into the belief that he was furthering justice. If the grounds of the defence in ^.g cgge “re SUpp0r(ak]c? and if the clerk’s allegation, that he conceived the alteration was for the furtherance of justice, alleging that if he did wrong, it was only an error of the head, not of the heart, would be sufficient to warrant this court in permitting him to retail]; his office, what clerk could not come forward, covered with such a shield of defence even against an accusation of the most flagrant and outrageous injustice?”
” ^se f ' jud^e son to the petition fora fo- earing,
This was a sufficient answer to the petition of Barry, and it certainly applies as well to that of Chambers. Chambers has done more than Barry did. He. has presented to the auditor, for the purpose of drawing money, a paper certified by himself as clerk, purporting to. be a formal order of the court in detail, entered on his record book, when there was no original, from which the copy could have been transcribed. Was not this a voluntary act? Was it not an improper act? Was it not an act which, if generally sanctioned, may lead to the most injurious consequences? What might be expected, if such a privilege be accorded to all clerks, and similar practices should become common among them? Are they to. be suffered to alter their records, or to make judgments ad libitum for the court, whenever they may suppose that no harm will be done? Are they, (which is even worse still,) to authenticate, as copies from their records, judgments, or other things, which they do not contain? Let any just, or wise, or prudent man, answer these questions in the affirmative, if his conscience will allow him to do it, and he will find that he is giving his sanction to a doctrine, which will render clerks irresponsible, and make the constitution, practically, a dead letter, as to them and their acts.
It has been asked, why, if a clerk should be removed for correcting or supplying a judgment, he should *149 not be equally liable to removal, for omitting to. enter a judgment given by the court, or should enter it erroneously? The answer is easy and has already been given; the best clerks may, and often do, forgpt to make full and perfect entries, or commit errors in entering or copying judgments; all men maybe expected to fall into accidental omissions of this sort, and therefore, for such an error alone, no clerk ought to be dismissed. But clerks are not .liable to the mistake altering judgments, making judgments, or certifying as judgments whatare noton their books. It is impossible that such a mistake can occur, When there is no record, the clerk cannot, through mistake, write out, in form, what purports to be a copy; and if one who may do so, shall be excused, all others must be permitted to do so, and then there will be no check on them but their own discretion, and no security for the citizen but their intelligence and integrity.
of judge Itobertson to the P^tíor! f°r q eann«’
The opinion in the case of Barry, shows that clerks may do acts which amount’to misbehavior in office, whether their motives are good or bad; and it clearly sustains this court, in the opinion, that the acts proved against Chambers, are such as imperiously require judgment of amotion.
The minute book is not entirely free from suspicion, But lam not inclined to examine this topic, because it is not indispensable to the argument, that I should do so. But if the entry now shown on the tarn out leaf be genuine, (and if the other leaves which were torn out contained no rpcision of it,) it does not tend, in the slightest degree, to prove that the certificate of Chambers w'as true, or that he was authorized to make it. If the judge render judgment for A. vs. B. which is noted in the minute bool?, but not entered on the order book, shall the clerk, because he knows that judgment was given, and believes that the omission to record it wili be corrected at the next term, be suffered' to issue an execution on it, or write out, in form, such a judgment as ought to have been entered, and certify it to be a copy from his record? If he be permitted tp do this, what shall he not do?'
To place the conduct of Chambers in the most favorable light, it is not less improper than the act just *150 supposed'. It is -that act precisely. Can any tiling then, be proved, to justify his acquittal, when it is admitted that he drew up a formal order, and certified it as a copy from his record, knowing that it was not a copy, or not knowing whether it was or not? The authority of the case of Barry, and the clear convictions of my own mind, would not allow me to acquit him, if there had been no evidence, except the solitary fact that he certified as a copy, what had no original. But the counsel deceive themselves, if they suppose that the parol evidence furnishes any palliation for this glaring error.
Response of judge Robertson to the petition for a ra-hparing.
The court did not wish to affix on Mr. Chambers any mark of reproach; nor by attributing to him dishonest intentions, to wound his sensibility or touch his moral character. I still hope that Mr. C’s. conscience may never rebuke him for impure motives. But if there has been an obliquity of purpose in his conduct there is certainly nothing in the testimony which could satisfactorily vindicate him from its imputation, or rescue him from the degradation, which the proof of it would justly bring down upon his moral character. I am not disposed even to intimate, that the evidence would justify a judicial decision, that there had been any wicked or sinister design manifested in this unfortunate transaction. Whatever the world may think when the facts shall be scrutinized, and whatever, personally, I might be authorized to suspect, I would not, as a judge, if motive were essential in this case, pronounce sentence of guilty. And I do cherish the hope that Mr. Chambers has not been guilty of any reprehensible designs, whilst I regret that he has failed to counteract, as satisfactorily as would have, no doubt, been desired by himself, the force of some facts intended to excite suspicion that his aim was selfish. He says, however, in his affidavit, that he can now explain those facts.
The evidence stated in the opinion of the court, was detailed, as stated, and the counsel have not complained of any material error in that statement of it. Lyle, it is true, was unable, in speaking of conversations with Chambers, to repeat the precise words used; but he often said, in giving his testimony, that he could not *151 possibly bo mistaken in the fact, that Chambers, in the spring after the money was drawn by him, acknowledged to him that, wanting money in Frankfort, he had taken the liberty to draw the allowance to Hans Pee-pies, supposing that he could take that liberty with him, Lyle; and that on being told that there was no order for the allowance, on the record, he replied, if so, it could be arranged at the next court. Nor can there be any mistake in the fact, that Lyle has the receipt of Mrs. Peeples, for the three months for which Chambers had drawn. It was also proved, as stated in the opinion pronounced in this case, that Holland never acted as committee; liad never drawn a cent of the allowances, and certainly did not sign or know any thing of the order, which purported to be sigued by him, and by which Chambers drew the money from the treasury. Chambers himself, seemed to admit that the signature was not Holland’s, and he made no attempt to prove whose it was or how it was procured. He seemed to admit, and so did his witness, J. T. Johnson, that Holland’s name was not written by Rhodes Thompson, a former committee, and Thompson himself swore that it was not.
Resp~nseof judge Robertson to the re-hearin°[a
' From these indisputable facts, it may be inferred that Chambers bad presented the order without the knowledge or authority of Holland; drew the money to meet some personal exigency; had not accounted for it when Lyle had a conversation with him in the spring-after the money was drawn, and that he procured the report to he signed by Holland, to the March term, to give sanction to what he himself had done; Holland knowing nothing about the facts, reported as he and others swore.
Now, whether all these facts are evidence of improper motives, is for others to judge. 'They may be consistent with perfect integrity; Chambers might have neglected or forgotten to pay over the money, without intending to appropriate it fraudulently to his own use, possibly he had paid it; he might have supposed there, was no impropriety in signing or suffering some other person to sign, Holland’s name to the order, believing thatif the money should be drawn, the mode of getting if would not he important; after he discovered that *152 Lyle ascertained that it was probable the money had not been appropriated to the use of the lunatic, Chambers might have honestly thought that it would be right to tell Lyle how and why it had been drawn,and thereupon, account to him for it, although he had not been entitled, before, to receive it; and he might too, have supposed, that although there was no allowance made on the record book, yet as the court had intended to make one, there would be no impropriety in certifying a copy of one such as it would have been; if it had beén made, and presenting it as the true copy of ageniR ine original;
Response of judge Robertson to the petition for a re-hearing.
All this may be true. 1 wish it may be, and cannot say that it is not. But I must repeat, that there is nothing in the facts proved, that can, in the slightest' degree, extenuate the acknowledged and unjustifiable act of presenting a false certificate, knowing it to be untrue, or at best, not knowing it to be true. The entry in the minute book, if genuine, did not authorise the certificate. The paper exhibited as a copy of the record, is not a copy from the minute, and does not resemble it, but is a copy of what the order would have been on the record book; and the‘clerk had no more right to certify such a paper, as true, than he would have had to certify a forfnal judgment, from the note in his minute book, when no judgment had been enfer-cd on the order book.'
The alledged discovery of new testimony cannot, as may have been seen from the tenor of this argument, have any effect on the petition fora new trial. If ithad been produced on the trial, it could not have had any essential influence on the decision. It might possibly have given to the case a more satisfactory moral aspect; but it could have had no other tendency. It is strange, however, that if it exist, it was not offered before. Most of the witnesses, if not all, mentioned in the affidavit, were in court during the trial.
There is not the remotest analogy between the case of judge Chase, and this case; nor is there any fitness in the comparison of this to a prosecution for murder, or other crime. The difference is so essential and obvious, that it is' not necessary to state any reasons to make it more plain. This court can take' no cogoi *153 sanee of crime, except so far as it [affects official conduct.
Response of judge Robert-' son to the petition for a re-hearing.
The counsel in argument, expressed an apprehension, that the opinion against Chambers, would} if applied to other cases, result in the removal Of every tlerfe in the state. I hope not. it would be as humiliating as it would b¿ alarming, to ascertain that clerks generally, have been guilty of such an abuse of the trust confided to them, as that established oh Chambers. But if Others háVe done-as he has done, they ought to give place to those who would understand and perform more faithfully, their important düti'és. And if other clerks have taken the liberty to make records without authority, or to certify as copies from their records, what has no resemblance on the record, whether with or without motive, it is the more necessary that it should be known as soon ás possible,'that such practices are not to bd tolerated; The best interests of the peoplé demand that süch malfeasances shall be ’corrected, and prevented in future, it is earnestly hoped that the example furnished by this ease may have a salutary effect.
, As to Mr. Chambers, he may derive sortie consolation from the fact, that he is not the first who has been doomed to the surrender of his office, to the public interest. Barry has gone before him, and if he had learned prudence from the lesson taught in Bafry’s base, this never would have occurred. It is his misfortune that he did not profit by that example. But i$ fee shall be so fortunate as to enjoy the approbation of his own conscience^ his greatest, and I would trust, his only loss will be that of his office, which he ought to bé willing to offer up cheerfully, to an inflexible principle of public policy, which, without regard to motives} forbids the act which he has done.
I have been unable to hear or see any reason for changing my opinion in this case. I would have been relieved from anxious and painful feelings if I could have changed it. But my convictions of my duty are tdear, and cannot be resisted. No event of my life could have given me more satisfaction than Í wbuld have enjoyed if, l coúld have pronounced a judgment of acquittal. But personal considerations must not *154 control public duty; justice mnst prevail, whatever may be the individual consequences.
Response of judge Robertson to the petition for a re-hearing.
Believing that my duty to my country and to my own 'conscience, demands that I shall not sanction, by-my'Opinion, the acts proved against Mr. Chambers, I cannot acquit him of the charges preferred against him, and must, therefore, adhere to the opinion which has been given. In doing this, 1 am sustained by the case of Barry, and by my own clearest convictions of public duty. My judgment cannot compromise with my feelings, nor can my official-conduct be directed by my personal wishes.
The importance of the case has induced us to present separate replies to the petition.
Having no longer time for the preparation of this response, than that which has elapsed from the last adjournment of the court, it is, I have no doubt-, liable to'very just-criticism. But whatever may be its imperfections of style or method, I am perfectly satisfied with its principles. I believe they are such as the integrity and veracity of the public -records!, imperiously require this court firmly and uniformly to maintain, in defiance of all personal consequences; and as far as I may have the power to affect them, by my opinions, they shall be maintained undeviatingly, in every case in which it shall appear that they are in peril.
If Mr. Chambers’ intentions were good, the judgment against the act alone, cannot injure his character. ]f they were improper, an acquittal for that act could not justify or extenuate them.-
What I have said of motives, Í considered proper; The petition required this much. I do not wish to be misunderstood. Whilst 1 w'ould be unwilling to decide that the motives of Mr. Chambers were corrupt, candor will not permit me to say that I could, upon the evidence, give them the sanction of my unhesitating approbation.
The task which I have now performed, was extremely unpleasant to me. But entertaining the opinionwjnch I do, I had no alternative but to remove Chambers, or to sacrifice my own judgment. Justice must *155 take its course; therefore, the opinion delivered in’this case, must remain unaltered.
Responso of judge Underwood to the petition for a re-hearing.
Opinion of
Judge Underwood.
The interest manifested in behalf of the defendant, by his learned counsel, the importance of the result to the individual accused, and the belief seriously entertained, as declared in the petition.for a new trial, “that the views of judicial policy with which the opinion rendered in this case, is made up, lead to the establishment of principles and precedents in our criminal jurisprudence, alike novel and dangerous,” have induced the members.of the court to reconsider their former opinion, and. to give to the application fora new trial, that attention which the magnitude of the interests involved imperatively required.
Í should deeply regret if, at this early period of my judicial fife, I were instrumental,.in the smallest degree, in establishing principles and precedents, alike novel and dangerous. I am. sure that no. pride of opinion would induce me to adhere to the. doctrines and principles heretofore advanced, when my judgment is convinced that they are radically erroneous. That man who prefers holding to. error for the sake of consistency, at the expense of bis conscience, may hide a corrupt heart from the world, but he cannot conceal it from himself.
The first point which I shall re-investigate, is that which relates to the motives of clerks, and the consideration which this court should give their motives, when arraigned for official misconduct. The opinion delivered states, that “in adjudicating upon the conduct of clerks, this court cannot enter into a consideration of the motives which influence their conduct, &c.” I am convinced that this language is too broad, and that it would be detrimental to give it the unlimited operation, which the counsel for the accused seem to think the court intended it should have. It was only used, and intended to be applied by the court to certain supposed and enumerated offences, which, if established, would require the removal of a clerk from office, and which ought not to be excused on account of the purity of the motive that may have iniUienjeed their per *156 petralion. The moral conduct of men, I admit, is to be judged of and determined, by the purity or turpitude of their motives; but the official conduct of men is not exclusively to be measured by that standard. The effect of tolerating official misconduct, because the motive of the officer was pure, and establishing a universal rule, that there should be no amotion from, pffice in those cases, where the detrimental acts of officers' pan be satisfactorily traced to a good motive, wouldi overturn those principles of responsibility and accountability which the constitution, from considerations of public policy, has wisely secured in regard to clerks. If these answers were received, “I did not know it was wrong;” “I really meant no harm.” “I erred from the best motive. I now know my duty and will observe it in future;” and the court by being satisfied, that such answers were founded in truth, were to dismiss the accused, content with the apology, such a course would, in my opinion render useless that check upon official delinquency which the constitution has provided, and which the welfare of the community requires this court to enforce, Suppose evidence is set out in a bill of exceptions, and signed by the court, and the clerk should obliterate or insert the word not, so as to, change the entire meaning of the testimony, ought he to be excused because his motive was pure? I think not. And why not excuse him? Because public policy forbids it; because the toleration of such conduct would license all other clerks to do similar acts, relying on good motives for protection, and thus distrust and suspicions in regard to pur records and judicial proceedings, vvould be introduced, which would be in themselves evils deeply to be deplored. It was from the contemplation of striking cases such as these, that the language was used, intimating that this court could not enter into the consideration of motives, and as applicable to such cases, I still think it correct. But there are many acts which may be performed, that would or, would not amount to breach of good behaviour in office, just as the motive which prompted them might bo vicious or virtuous,. To this class may be given such acts as the court, in the case of Arnold, adjudicated upon, by bringing in his motives to determine the character of the act, and yarious others similar in their *157 nature. The case of Barry presents instances of official misconduct, which the court would not permit any honesty of intention to justify. Speaking of Barry’s conduct in suffering the replevin bond to be altered, and which act was defended upon the ground that there was no criminal intention and no interest which could have operated on Barry, to induce hiip to permit the alteration, the court say, “the act was a deliberate one, it was a voluntary .one, and it was unlawful; nothing, therefore, can justify it.” The court says further: “If he (Barry) was in error with regard to his authority, it shows such gross ignorance, as to render his tenure of the office dangerous to the community.” The authority of this case confirms my opinion that there may be cases of official misconduct not to be excused by any Consideration of motives. In regarding the clerk in such cases as a moral agent, as a man, I would respect, and consider his motiye; but in regarding him as an officer, I would only look to his act as violating the du? ties-of his station, in the correct performance of which, duties, society has so much at stake. And I would say to him asa judge, “your motives may have beetn pure but I cannot sanction, on that account, acts of such dangerous tendency, by permitting you to remain in office,”
Responso of judge Underwood to the petition for a re-hearing.
Response of judge Under-Wood to the petition for a re-hearing.
The acts of clerks are principally ministerial, but they are, to some extent, judicial or quasi judicial. For instance, in preparing a record for the court of appeals, they must necessarily judge and determine what constitutes the record; what belongs to it and what does not. In such a case, if the clerk withholds what is part of the record or inserts what does not belong to it (unless the violation of duty be so palpable ps to show corruption in th.e very act,) and should be prosecuted for that cause before this court, it would be very proper to considerthe circumstances and motives which influenced his conduct. So likewise, in many .other cases, the motives and. reasons of his conduct might be given in evidence, for upon them might the establishment of a charge of breach of good behaviour entirely depend. It was not intended by the opinion heretofore delivered, to close the doqr and to make no allowances for these imperfections to which all are gubject, in every station of life. fta tfye jnuUjffirion§ *158 duties which clerks have to perform, that mistakes should sometimes be made by the most accurate,.is to be expected, and I trust no rule will ever be established, which will construe a mere mistake into a forfeiture °^'lce’ or to. preclude an investigation into the motive and character of the transaction, to ascertain vvhetherit be a mere mistake or something worse. I was intended by the original opinion in this cause. B.ut, notwithstanding this,I am still of ©pinion that there are cardinal points to be observed by clerks in their conduct, and which, if disre: garded, will place them in a condition where no purity of motive should save them from removal. Among these are, the alteration of their records and the certifying as a record, what does not exist., I cannot permit a clerk to excuse himself in these cases, by urging that the alteration was designed to make the record as it ought to have been in the first instance, and that he acted with the best intentions, or that he made out and certified as the record,, that which, although not true, he had every reason to believe was true. I.can readily suppose that a clerk,in copying a.record, may make a mistake by leaving out a word, or sentence, or that he might insert one word for another, or that he- might inadvertently introduce a word having no relation in meaning to the subject matter of the record;, but I cannot well imagine that he could introduce whole sentences, foreign to the subject matter of the record,, and thereby give a different meaning to the record, without design. But to suppose that a clerk could, make out and certify as the record, what does not exist, and that he could do so without committing a palpable breach of good behaviour, would be to indulge in conjectures and to frame excuses for official delinquency, against all propriety and reason. How can such a thing be done? not by having the record before him, for that cant be present which docs not exist. The clerk must, therefore, fancy to himself that there is such a record, and then, without looking for it or getting it to copy from, he must make out the certified copy according to his recollection. This, in my opinion, is manifestly improper, and if clerks will undertake to act from memory, without having the record before them, they must abide th.e consequences in case
ftesponse of judge Underwood to the ro-hearin°r a
Response of judge Underwocid to the petition for a re-.hearing.
their memory deceives them. The case is much worse where there is no record, and consequently the idea of making the recollection of a thing which never existed, justify a clerk’s conduct,is a palpable absurdity. Suppose A recovers a judgment against B for $100, and wants a copy of the record to be used in another state, in what light should the conduct of a clerk be viewed, who, from having a vague or a vivid recollection of the recovery, should undertake, from his memory, to snake out a copy of the proceedings for the use of A,without looking info the papers and record? Suppose the copy so made out, did not impose a quarter extent of liahiiityon B, although the variances between the" copy and the record, in a variety of particulars, were striking upon the slightest comparison? Could any court refuse to remove a clerk who would thus act? f think not. And yet it might be urged in his behalf, that B could notbe injured by giving to the false copy, all the force and effect of the genuine record, as by it he was not compelled to pay more than he should do, rind that no bad motive could possibly operate to induce the clerk to make such false copy. All this might be true; the clerk may have been influenced by a desire to perform the business with speed, and may have conscientiously thought, that it was not worth while to delay and hunt up all the papers and the record, to make out a literal copy, and then to examine and see that it was correct. Ought a judge of this court, in such a case, to enter into a consideration of the clerk’s motives, with a view to excuse him for such a dereliction of duty? I think not; and I am moreover of opinion that if this court were to do if, and seta precedent in such a case, by the acquittal of the delinquent, that it would amount to absolution on the part of the clerks, from all system and order, and that the interests of the community would not fail to suffer deeply by the establishment of such a precedent. The present case is much stronger against the clerk than the one supposed. It is not a false copy of an existing record; but it is a fabrication, founded on an imaginary record.
Viewing the subject in the various aspects in which it has been presented, my mind has settled on this conclusion, that there are acts of official misbehaviour^ *160 which should admit of no palliation, so far as it regards removal from office, by the purity of the delinquent’s motive; that there are acts which, per se, constitute sufficient cause for amoíión and imperatively require aud that there are acts susceptible of such explanation and mitigation, from , the purity of the motive which induced them, that they will not amount to ^reac^ g00^ behaviour in office. I cannot concede the position which seems to be assumed, that the rules applicable to the trial of criminals, for breaches of the penal laws, are those that should govern, to their full extent, the trial of clerks for breaches of good behaviour. it is not necessary to express any decisive opinion on this point, and I will not enter into any argument in relation to it. Nor do I wish or intend to disturb, by any opinion in this case, “the known and long settled principles of criminal jurisprudence.” I do not admit that it is necessary to attach to a clerk the turpitude of a criminal, to justify his removal from office. A very honest man may make a very indifferent clerk, and a man despicable for his vices,- rnay make an excellent clerk. It is proper to seperate the character of the man, from the character of the officer, and when lhat is done, it may readily be perceived that there might be great propriety in making a distinction between the rules for the trial of the man for crime, and those for the trial of the officer, for breaches of goodbehaviour in office. This court has no power to remove a clerk for crimes committed, so long as he discharges the duties of his office well, nor should it be induced to overlook breaches of good behaviour, because the officer is honest as a man, or acts from good motives. The case of judge Chase, impeached before the Senate of the United States, is not considered as parallel to the present. If it were necessary in his case to consider the quo animo with which he acted, In every instance, to justify a conviction under the charges and specifications brought forward against him, Í do not perceive how it would necessarily follow,that this court should be controled by the quo animo of a clerk. The case of Barry is an express authority-to the contrary. The.act of altering or making a false certificate of a record, in its consequences, is the same, let the qúo animo óf the clerk be what it may, *161 good of bad. Removal from office is not intended as a punishment for ithe criminal act of the clerk, but it is designed to protect the community by insuring the faithful discharge of official duty, and ,by securing á preservation and integrity of the records. For criminal conduct* clerks cannot be punished before this tribunal. In Bafry’s case the court would not listen to a charge of bribery. The counsel for the accused, seem to me, tó have looked ujfón the sentence of removal, as a punishment for some crime. It is not, I think, to be viewed in. thatligbti If a clerk commits a forgery on the record, this court would remove him for it, but it would belong td the circuit court to punish for the crime.
Res onse of judge Underwood to the reheari/0™
Itqspbnsb of judgp Underwood to tho petition for a re-hearing.
The next ground of Objection to the opinion delivered, grows out of the operation of those rules defining what is good behaviour in clerks; or rather, the objections spring from the manner in which the counsel for the accused have supposed that those rules will operate, and it is insinuated that no clerk, no matter Wliát his qualifications and talents may be, can h'old his office three months pndei- the application of those rules to their conduct: I should regret that so much rigour should be found in any rule of this court, as to operate: oppressively upon any class of citizens. I do not believe that the rules which only require of clerks the performance of (heir duties, can ever operate so as to cause the removal of those who, possessing the requisite capacity* attend with reasonable diligence and honesty, to the discharge of their duties; and if they should so operate as to produce the removal of those who are destitute of capacity, or thbse who negligently attend to their duties, it is to bfe hoped that their places will be supplied by others; who will better serve the community. Any supposed rigour to be found in the language employed in the original opinion, in regard to the exclusion of the motives of a clerk from consideration, has been mitigated, I trust, as far as it should be done, by the views contained in the responses' to the petition for a new trial. When the court, after considering the evidence, are convinced that the clerk has been guilty of a breach of good behaviour, and that the act, if tolerated, would be dangerous in its *162 consequences, the duty of the judge cannot be discharged but by passing sentence of removal. It is intimated, that to constitute a breach of good behaviour, In the sense of the constitution, it is necessary that there should be a continued series of bad acts cornmitted by the clerk. While I admit that mistakes and misjudgments, which are not corrupt, may be over-}00lied as not amounting to such breaches of good hehaviour as will justify the removal of the clerk; yet I am of opinion, that one act of dangerous example and mischievous tendency is enough. I see no reason for waiting until more mischief is done, with a view to •say,“behold a series of bad acts; it is time to remove you.” On the contrary, I think it more compatible with reason to say, “here is one bad act; you ought not to have an opportunity to commit another.”
Res onsn of judge Underwood to the petition for a re- earing,
In respect to the minute book, when it is signed and adopted by the court as the record, I would regard it so far as to justify a clerk in acting upon it, as matter of record. It is the'faultof the judge and not of the clerk, that such memoranda as are to be found in a minute book, with their defective brevity, should have the character of records imparted to them. The acts of the clerk, therefore, within the scope of these memoranda, may and ought to be tolerated. But so far as my knowledge extends, I have never understood that any clerk ever regarded the minutes made by him, and not sanctioned by the approving signature of the judge, as a justifiable foundation for any official act. I am clearly of opinion that such minutes ought not to justify any official act of a clerk. I am also, thoroughly satisfied that the understanding of every one, conversant with a minute book and record proper, recognizes the invalidity of the minutes, unless signed by the judge. I cannot, therefore, bring my mind to yield its assent to the propriety of permitting a clerk to ex-cuso his official misconduct by taking shelter behind the leaves of an unsigned minute book. The very fact, that the judges sometimes sign the minutes where they cannot be carried at length, on the order book or record proper, for want of lime, is conclusive to show that the minutes, not signed, are not to he regarded by the clerk as the basis of any official act. To justify Chambers in this case, even upon the score *163 of motive, we must first believe that he regarded the unsigned minute as equivalent to the record; or that he did not believe it was necessary to consult the record; or that he thought looking at the minute was enough;. or that he thought it was sufficient to act from memory. Now it is difficult to believe that any clerk could entertain such notions; and if I were convinced that a clerk did entertain them, seriously and honestly, I should pronounce him destitute of the talents necessary for his station. It does seem to me,, therefore, that the fact which has been established,.beyond all doubt, that Chambers did certify, a? of record, an allowance for the support of Hans Peeples, when there was no such record, and when he had no proper ground upon, which.to assume the existence of such a,record;, does,. per se,.amount to such misbehaviour.as. justifies,hi§.removal, and when it is coupled; with other facts.in this case, I see no room for doubt or hesitation., Pwill not recapitulate the evidence; it is.se,t out correctly in the former opinion, so far- as it relates to.the charges upon which the sentence of the court is predicated. I.do not recollect to have said, when the opinion was delivr ered, any thing not contained in the within opinion. I am sure that I did not.
Rcgnga 0f judge Underwood to the a-
In the review which I have taken of the opinion heretofore delivered, and its principles, aided by the petition which has been presented, I have discovered nothing which induces me to think the sentence against Mr. Chambers, wrong. It is, therefore, my opinion that if remain unchanged.
I. have also considered the affidavit filed; and am of opinion that, the motion, for a-new trial should be overruled.